UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HEALTH CARE FOR ALL, WISCONSIN CITIZEN ACTION, UNITED SENIOR ACTION OF INDIANA, JUDITH C. MEREDITH, MICHELLE MADOFF, ROSE LOHMAN and CAVALIER HOMES, INC., individually and on behalf of all others similarly situated,<br><br>                       Plaintiffs,<br><br>    v.<br><br>PFIZER INC., PHARMACIA CORP., and G.D. SEARLE & CO.,<br><br>                       Defendant. | Civil Action No. 05-10707-DPW |

**INDIVIDUAL PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II. PROCEDURAL HISTORY.....................................................................................2

III. STATEMENT OF FACTS .....................................................................................2

IV. ARGUMENT ..........................................................................................................5

    A.  The Applicable Standard for Dismissal ...................................................5

    B.  The Complaint Properly Pleads RICO Violations ...................................6

        1.  Defendants' Violation of 18 U.S.C. § 1962 Proximately Caused Plaintiffs' Injuries ............................................6

        2.  The Complaint alleges with sufficient particularity that Defendants conducted the Celebrex Enterprises' affairs through a pattern of racketeering activity..............................................7

    C.  Plaintiffs Have Stated Proper Claims Under Each State Consumer Protection Statute ................................................11

        1.  Defendants Violated New Jersey's Consumer Fraud Act.........................11

        2.  Defendants Violated Massachusett's Consumer Fraud Act......................16

        3.  Defendants Violated Arizona's Consumer Fraud Act ..............................18

    D.  Plaintiffs Have Stated a Proper Claim for Unjust Enrichment .............19

V.  CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Ahmed v. Rosenblatt*,
118 F.3d 886 (1st Cir. 1997) .......................................................................................10, 11

*Bolduc v. United States*,
2002 U.S. Dist. Lexis 13830 (D. Mass. July 30, 2002) .....................................................5, 6

*Boston & Maine Corp. v. Hampton*,
987 F.2d 855 (1st Cir. 1993) ..........................................................................................8, 10

*Brown v. United States Stove Co.*,
484 A.2d 1234 (N.J. Sup. Ct. 1984) ...................................................................................12

*Contey v. New Jersey Bell Tel. Co.*,
643 A.2d 1005 (N.J. Sup. Ct. 1994) ...................................................................................12

*Cordero Hernandez v. Hernandez Ballesteros*,
333 F. Supp. 2d 6 (D.P.R. 2004) ........................................................................................11

*Cottam v. CVS Pharm.*,
436 Mass. 316, 764 N.E.2d 814 (2002) ................................................................................7

*Cox v. Sears Roebuck & Co.*,
647 A.2d 454 (N.J. Sup. Ct. 1994) .....................................................................................11

*Deane v. Snelling & Snelling Pers. Servs.*,
1997 Mass. Super. Lexis 250, at 11-12 ...............................................................................17

*DeLima v. Exxon Corp., slip op.*,
No. A-3536-99T3 (N.J. Super. Ct. App. Div. Dec. 4, 2000) .......................................13, 14

*Doyle v. Hasbro, Inc.*,
103 F.3d 186 (1st Cir. 1996) ...............................................................................................6

*Furst v. Einstein Moomjy, Inc.*,
860 A.2d 435 (N.J. Sup. Ct. 2004) ...............................................................................14, 15

*Gloulet v. Actionvest Mgmt. Corp.*,
No. 00-1310, 2002 Mass. Super. Lexis 291 (Super. Ct., Aug. 1, 2002) ............................17

*Greebel v. FTP Software, Inc.*,
194 F.3d 185 (1st Cir. 1999) ...............................................................................................5

*Grossman v. Waltham Chem. Co.*,
14 Mass. App. Ct. 932, 436 N.E.2d 1243 (1982) ..............................................................17

*Heindel v. Pfizer, Inc.*,
2004 U.S. Dist. Lexis 12232 (D.N.J. June 7, 2004) ....................................................14, 15

*Hewlett-Packard Co. v. Boston Sci. Corp.*,
    77 F. Supp. 2d 189 (D. Mass. 1999) ...........................................................6

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ...........................................................20

*Kaufman v. I-Stat Corp.*,
    754 A.2d 1188 (N.J. Sup. Ct. 2000) ..........................................................14

*Kuney Int'l, S.A. v. DiIanni*,
    746 F. Supp. 234 (D. Mass. 1990) ..........................................................8, 9

*Lareau v. Page*,
    840 F. Supp. 920 (D. Mass. 1993) ...........................................................7

*Lemelledo v. Beneficial Mgmt. Corp.*,
    696 A.2d 546 (N.J. Sup. Ct. 1997)...........................................................16

*In re Lupron Marketing & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass. 2003) ..............................................7, 9, 10

*MacDonald v. Ortho Pharm. Corp.*,
    394 Mass. 131, 475 N.E.2d 65 (1985) .......................................................7

*New England Data Servs., Inc. v. Becher*,
    829 F.2d 286 (1st Cir. 1987)...............................................................8, 10

*New Jersey Citizen Action v. Schering-Plough Corp.*,
    842 A.2d 174 (N.J. Super. Ct., App. Div. 2003)..........................................15

*Perez v. Wyeth Labs.*,
    734 A.2d 1245 (N.J. Sup. Ct. 1999)..........................................................12

*Ramanadham v. New Jersey Mfg. Ins. Co.*,
    455 A.2d 1134 (N.J. Super. Ct. App. Div. 1982)..........................................12

*Rhone v. Energy North, Inc.*,
    790 F. Supp. 353 (D. Mass. 1991) ..........................................................11

*Sebago, Inc. v. Beazer East, Inc.*,
    18 F. Supp. 2d 70 (D. Mass. 1998) ...........................................................7

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985).............................................................................6

*Sickles v. Cabot Corp.*,
    2005 N.J. Super. Lexis 217 (App. Div. July 7, 2005)................................15, 16

*Siemer v. Assocs. First Capital Corp.*,
    2001 U.S. Dist. Lexis 12810 (D. Ariz. Mar. 29, 2001)...............................18, 19

*Slaney v. Westwood Auto., Inc.*,
    366 Mass. 688, 322 N.E.2d 768 (1975) ......................................................................16

*Spring v. Geriatric Auth. of Holyoke*,
    394 Mass. 274, 475 N.E.2d 727 (1985) ......................................................................16

*Thiedemann v. Mercedes-Benz USA, LLC*,
    872 A.2d 783 (N.J. Sup. Ct. 2005) .............................................................................14

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
    360 F.3d 220 (1st Cir. 2004) ........................................................................................8

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
    2003 U.S. Dist. Lexis 8846 (D. Mass. May 21, 2003) ..............................................8, 9

*United States ex rel. v. Parke-Davis*,
    147 F. Supp. 2d 39 (D. Mass. 2001) ......................................................................6, 8, 9

*United States v. Cianci*,
    378 F.3d 71 (1st Cir. 2004) ...........................................................................................7

*White v. Union Leader Corp.*,
    2001 U.S. Dist. Lexis 24516, 2001 DNH 126,
    2001 WL. 821527 (D.N.H. July 13 2001) ..................................................................11

## STATUTES

28 U.S.C. § 1407 .............................................................................................................2

18 U.S.C. § 1961(5) .........................................................................................................7

18 U.S.C. §§ 1961 ...........................................................................................................6

18 U.S.C. § 1962 ..........................................................................................................6, 7

18 U.S.C. § 1962(c) ......................................................................................................1, 6

18 U.S.C. § 1964(c) .........................................................................................................6

Fed. R. Civ. P. 8(a) ..........................................................................................................6

Fed. R. Civ. P. 9(b) ..............................................................................................6, 8, 9, 11

Plaintiffs Judith C. Meredith, Michelle Madoff, and Rose Lohman, individually and on behalf of all others similarly situated, respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss Plaintiffs' putative class action complaint.

## I.    INTRODUCTION

The allegations set forth in Plaintiffs' Class Action Complaint (the "Complaint") expose a widespread, fraudulent scheme whereby Defendants falsely marketed and promoted the prescription drug Celebrex in an effort to create demand for the drug as a wide-ranging pain reliever, allowing defendants to sell it at a premium over comparable drugs.  Although Defendants were well-aware that Celebrex had no proven superiority over competing drugs, and in fact had serious side effects, including gastrointestinal complications, blood clotting and clot-related cardiovascular events, and life-threatening skin reactions, they nonetheless pushed Celebrex to market on false claims of improved gastrointestinal safety while downplaying its other risks.

Defendants used the U.S. Mails and Interstate Wire Facilities on thousands, if not hundreds of thousands, of occasions to submit false and misleading marketing materials to governmental agencies, doctors, consumers, health-care providers and others throughout the country.  These materials were designed to conceal Celebrex's risks and falsely promote its safety and efficacy.  This fraudulent pattern of marketing and promotion persisted for more than four years and, unfortunately, it worked.  By the time Defendants ceased marketing Celebrex, plaintiffs had paid hundreds of millions of dollars for the drug, despite the fact that it was no more effective, and in fact far more dangerous, than less expensive alternatives.  Accordingly, Plaintiffs bring this action on behalf of themselves and all other similarly situated entities nationwide that paid some or all of Celebrex's inflated purchase price.  Because the Complaint adequately pleads claims for violation of 18 U.S.C. § 1962(c), violation of various consumer-fraud statutes and unjust enrichment, Plaintiffs respectfully ask the Court to deny Defendants' motion to dismiss.

## II.    PROCEDURAL HISTORY

This action is currently subject to proceedings before the Judicial Panel on Multidistrict Litigation (the "Panel").  Presently pending before the Panel are multiple motions for transfer and consolidation pursuant to 28 U.S.C. § 1407.  These motions encompass at least 33 lawsuits throughout the country involving related COX-2 drugs Celebrex and Bextra, including the present case, and are scheduled to be heard on July 28, 2005.  On May 13, 2005, the Panel advised that it might be "especially appropriate" for district courts to delay ruling on any pending motions "if the motion raises questions likely to arise in other actions in the transferee court and, in the interest of uniformity, might best be decided there if the Panel orders centralization." (Declaration of Thomas M. Sobol In Support of Plaintiffs' Opposition To Defendants' Motions To Dismiss ("Sobol Decl."), Ex. A).  Given the multiplicity of similar lawsuits throughout the country, every question raised by Defendants' motion to dismiss is likely to arise in other actions.  In fact, Defendants have already filed a similar motion to dismiss in *Steamfitters' Indus. Welfare Fund v. Pfizer, et al.*, 05 Civ. 3814 (RJH) (S.D.N.Y.), and *Hatcher v. Pfizer, et al.*, 05-208-SLR (D. Del.), raising the possibility of inconsistent rulings on virtually identical legal issues.  Under these circumstances, it might be especially appropriate for the Court to delay ruling on Defendants' motion.

## III.    STATEMENT OF FACTS

Celebrex belongs to a class of drugs known as non-steroidal anti-inflammatory drugs ("NSAIDs").  ¶ 27.[1]  Aspirin and ibuprofen are examples of well-known NSAIDs.  ¶ 27. NSAIDs reduce pain by blocking the body's production of pain transmission enzymes called cyclo-oxygenase ("COX").  ¶ 28.  There are two forms of COX – COX-1 and COX-2.  *Id.*

In addition to transmitting pain sensations, COX-1 and COX-2 have beneficial functions. For instance, COX-1 is involved in maintaining and repairing gastrointestinal tissue, while COX-2 is involved in the prevention of blood clots.  ¶¶ 29-30.  Accordingly, blocking COX-1 hampers

---

[1] "¶ __" as used throughout this brief refers to paragraphs of the Class Action Complaint unless otherwise noted.

the body's ability to repair gastric tissue and causes harmful gastrointestinal side effects, including stomach ulceration and bleeding, while blocking COX-2 encourages the formation of blood clots and causes various clot-related cardiovascular events, including heart attacks, strokes, unstable angina, cardiac clotting, and hypertension.  ¶¶ 31-32.  Traditional NSAIDs like aspirin block both COX-1 and COX-2 simultaneously, increasing the risk of ulcers in the stomach and intestines (because of a complex chemical balance in the human body, however, traditional NSAIDs do not cause blood clots, but actually reduce the risk of clots and help protect heart function).  ¶ 33.  Selective COX-2 inhibitors were developed to remedy this problem.

Celebrex was one of the new COX-2 inhibitors, Vioxx was the other.  ¶ 4.  Defendant Searle sought FDA approval on June 29, 1998.  In its pre-approval marketing plans, Defendants planned that Celebrex would be approved and that such approval would include an indication that it was safer than NSAIDs in protecting against GI complications.  ¶ 37.  The FDA granted new drug approval on December 23, 1999.  However, Defendants did not obtain approval to promote Celebrex as more effective than NSAIDs in preventing clinically serious GI events. The FDA warned Searle that any promotional activities "that make or imply comparative claims about the frequency of clinically serious GI events compared to NSAIDs or specific NSAIDs will be considered false and/or misleading …."  This finding by the FDA was a potentially serious blow to Defendants.  As a result, the Celebrex package inserts had to include a warning that its use presented GI risks. ¶¶ 39-40.

Defendants promoted Celebrex as offering all of the benefits of less expensive NSAIDs with none of the drawbacks, thereby turning Celebrex into a blockbuster drug with billions of dollars in yearly sales.  ¶¶ 5-6.  Before they began marketing the drug as being safer and more effective than other NSAIDs, however, defendants were well-aware that Celebrex had no proven superiority over other NSAIDs, and in fact had serious side effects, including known risks of blood clots, heart attack, stroke, unstable angina, cardiac clotting and hypertension.  ¶ 152.

Defendants funded a significant clinical trial to demonstrate that Celebrex had greater

gastrointestinal safety than traditional NSAIDs:  the Celecoxib Long-Term Arthritis Safety Study ("CLASS").  ¶ 41.  Defendants expected CLASS to show that Celebrex was statistically significant in reducing serious GI complication over NSAIDs and that the results would allow removal of the warning label.  Removal of the warning label was viewed as critical to breaking the NSAID barrier, *i.e.*, competing against NSAIDs based on GI superiority.  ¶ 42.  When the CLASS study was completed, the results were reported to the U.S. Food and Drug Administration's Arthritis Drugs Advisory Committee ("the Committee") as part of a request to exempt Celebrex from including a gastrointestinal safety warning in its package insert.  ¶ 44.

After reviewing the CLASS results, the Committee concluded that patients taking Celebrex had not experienced fewer gastrointestinal complications than those taking traditional NSAIDs.  In other words, CLASS showed that Celebrex failed to achieve its primary endpoint of reduced "clinically significant serious gastrointestinal events."  Without any proof of enhanced safety, the Committee then recommended that the Celebrex package insert contain the same gastrointestinal warnings as traditional NSAIDs, and advised further studies to assess the risk of COX-2 inhibitors when taken with aspirin.  Thus, Defendants' clinical studies did not have their intended effect:  Celebrex was not permitted to claim increased gastrointestinal safety over traditional NSAIDs.  ¶ 45-46.

Notwithstanding the FDA's limited approval, Defendants initiated a massive marketing campaign in which they promoted Celebrex as providing effective pain relief without the gastro-intestinal side effects of traditional NSAIDs.  ¶¶ 3-4.  Defendants' marketing and promotion of Celebrex was part of a scheme to create the impression and demand for Celebrex as a wide rang-ing pain reliever that would enhance consumers' abilities to live a normal life or engage in activi-ties such as running, playing a guitar, swimming, walking, taking exercise classes and a host of similar activities that many who suffer from chronic pain have difficulty performing.  ¶ 5.  The scheme was accomplished by unlawful means including, but not limited to, (i) the suppression of data showing the cardiovascular risks associated with the use of Celebrex (¶¶ 143-150); (ii) the

manipulation of data in an effort to show statistical significance of fewer serious upper GI events than those using NSAIDs when in fact the complete data failed to demonstrate a statistically significant lower rate of GI complications and, in fact, use of Celebrex for more than six months increased the risk of GI complications (¶¶ 51-56); (iii) the manipulation of data to give the appearance of superiority over NSAIDs when such superiority did not exist (*id.*); (iv) false promotional materials directed to doctors and consumers (¶¶ 72-142); and (v) the use of reprinted articles from prestigious medical journals that falsely claimed Celebrex was proven to be safer than NSAIDs (¶¶ 60, 62-71).

Defendants maintained this marketing campaign in order to create demand for Celebrex as a superior paint reliever, which in turn allowed them to sell it at a premium over other NSAIDs. ¶¶ 7, 9. Unfortunately, the scheme worked. Defendants created significant demand for Celebrex, allowing them to sell it for $2.53 to $6.45 per day depending upon the dose, while NSAIDs sell for 21¢ to 31¢ per day. ¶ 9. This continued until December 20, 2004, when Pfizer announced that it would stop all television, radio, newspaper and magazine advertising. ¶ 159. By that time, however, the Class had already paid billions of dollars for the drug, despite the fact that it was no more effective, than a 10¢ aspirin. ¶ 9.

## IV.    ARGUMENT

### A.    The Applicable Standard for Dismissal

A rule 12(b)(6) motion should be granted "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Bolduc v. United States*, 2002 U.S. Dist. Lexis 13830, at *3 (D. Mass. July 30, 2002) (quoting *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987)). "[T]his Court takes as true 'the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor.'" *Id.* (quoting *Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir. 1992)); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 200 (1st Cir. 1999). As a result, "[m]otions to dismiss are subject to limited inquiry, focusing not on 'whether a plaintiff will ulti-

mately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Bolduc*, at \*3 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

This Court recently observed that in cases like this "where the proof is largely in the hands of the [defendant], dismissals prior to giving the plaintiff ample opportunity for discovery should be granted sparingly." *Hewlett-Packard Co. v. Boston Sci. Corp.*, 77 F. Supp. 2d 189, 195 (D. Mass. 1999). *See also United States ex rel. v. Parke-Davis*, 147 F. Supp. 2d 39, 47 (D. Mass. 2001) (strict pleading requirements are relaxed where facts underlying the fraud are particularly within the defendant control).

**B.     The Complaint Properly Pleads RICO Violations**

The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), authorizes a private right of action by "[a]ny person injured in his business or property by reason of a violation of section 1962 of [Title 18]." 18 U.S.C. § 1964(c). 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Accordingly, Plaintiffs are authorized to maintain the present lawsuit if they were injured in their businesses or properties by defendants' "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir. 1996). As set forth herein, the complaint properly alleges each of these elements, and all other matters required to maintain an action for defendants' violation of 18 U.S.C. § 1962(c), with the specificity required by First Circuit precedent, Fed. R. Civ. P. 8(a), and, where applicable, Fed. R. Civ. P. 9(b).

**1.     Defendants' Violation of 18 U.S.C. § 1962 Proximately Caused Plaintiffs' Injuries**

Defendants argue that Plaintiffs' physicians, acting as intermediaries between Plaintiffs and the Defendants, somehow undermine Plaintiffs' allegations of proximate cause. But

Defendants' perfunctory invocation of the learned-intermediary doctrine is misplaced.[2]

The learned-intermediary doctrine provides an exception to the rule that a drug manufac-turer must directly warn consumers about the risks associated with its drugs. *Cottam v. CVS Pharm.*, 436 Mass. 316, 321, 764 N.E.2d 814 (2002) (citing *MacDonald v. Ortho*, 394 Mass. at 135). In order to fall within this exception, a manufacturer must provide an appropriate warning about the drug when it gives the patient's physician the necessary information to be disseminated to the patient. *Id.* In such cases, the physician's failure to warn is a superseding cause of the consumer's injury. *E.g.*, *Lareau v. Page*, 840 F. Supp. 920, 932 (D. Mass. 1993) (cited in Defs. Br. at 6). But Defendants herein did precisely the opposite. Far from providing physicians with the necessary information, Defendants blitzed doctors' offices with false and misleading literature and verbal presentations, and used the U.S. Mails and Interstate Wire Facilities on thousands, if not hundreds of thousands, of occasions to forward false and misleading materials to doctors, among others. ¶¶ 72-83, 184. Under these circumstances, the learned-intermediary doctrine is inapplicable and Defendants' motion to dismiss in this regard should be denied. *See In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 175 (D. Mass. 2003).

**2.  The Complaint alleges with sufficient particularity that Defendants conducted the Celebrex Enterprises' affairs through a pattern of racketeering activity**

RICO defines a "pattern of racketeering activity" as "at least two acts of racketeering activity" committed within a ten year period. 18 U.S.C. § 1961(5). A pattern is established where the predicate acts are related and they amount to, or pose a threat of, continued criminal activity. *United States v. Cianci*, 378 F.3d 71, 88 (1st Cir. 2004). That the facts alleged by Plaintiffs establish that Defendants committed at least two predicate acts during the relevant time period is not in dispute. Indeed, plaintiffs allege that each of the defendants committed thousands of individual acts of mail fraud and wire fraud. ¶¶ 180-84.

---

[2] This doctrine is described in *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 88 n.8 (D. Mass. 1998), and *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 135-136, 475 N.E.2d 65 (1985).

Defendants assert that Plaintiffs have not alleged their racketeering activity with particularity sufficient to satisfy Fed. R. Civ. P. 9(b).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Defendants assert that Plaintiffs' allegations of mail and wire fraud do not comply with Rule 9(b).  They fail to note, however, the First Circuit expressly relaxed Rule 9(b)'s pleading requirements pending further discovery for allegations of mail and wire fraud pursuant to RICO "because of the apparent difficulties in specifically pleading mail and wire fraud as predicate acts."  *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 229 (1st Cir. 2004); *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290-91 (1st Cir. 1987).  This relaxed Rule 9(b) pleading standard applies where plaintiffs are not directly involved in the alleged fraudulent scheme and thus cannot be expected to have personal knowledge of the facts constituting the fraud.  *See Becher*, 829 F.2d at 290-91 ("it is seemingly impossible for the plaintiff to have known exactly when the various defendants phoned or wrote to each other or exactly what was said"); *Kuney Int'l, S.A. v. DiIanni*, 746 F. Supp. 234, 237 (D. Mass. 1990) (civil RICO claim was pled with sufficient particularity).  Courts recognize that "it is difficult to perceive how the defendants would have communicated without the use of the mail or interstate wires." *Becher*, 829 F.2d at 291.  And thus, "when the opposing party is the only practical source for discovering the specific facts supporting a pleader's conclusion," or when the facts underlying the fraud are "peculiarly within the defendants' control," Rule 9(b) requires less specificity of pleading pending discovery.  *Boston & Maine Corp. v. Hampton*, 987 F.2d 855, 866 (1st Cir. 1993).  *See also United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 2003 U.S. Dist. Lexis 8846, at *13 (D. Mass. May 21, 2003) (quoting *Boston & Maine*), *aff'd*, 360 F.3d 220 (1st Cir. 2004); *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d at 46 (same).

The Court also weighs Rule 9(b) against the general policy of Rule 8 notice pleading. *See Karvelas*, 2003 U.S. Dist. Lexis 8846, at *13; *Kuney Int'l*, 746 F. Supp. at 237; *accord Parke-Davis*, 147 F. Supp. 2d at 46.  Plaintiffs' complaint thus need not plead all of the evidence

or facts supporting the allegations of fraud.  *Id.* at 46-47.  "Detailed facts are not required where allegations of fraud in the complaint set forth the specific basis for the claim."  *Kuney Int'l*, 746 F. Supp. at 237.  The purposes behind Rule 9(b), each of which is fulfilled here, include:  (i) put Defendants on notice and enable them to prepare meaningful responses to charges of fraud, which Plaintiffs have done here by including general allegations of the fraudulent scheme, *see* ¶¶ 175-98; (ii) provide a basis for demonstrating that the suit is not simply a "strike suit" or a groundless fraud claim as a pretext to discovering a wrong; and (iii) protect Defendants from groundless charges.  *Karvelas*, 2003 U.S. Dist. Lexis 8846, at *13; *In re Lupron*, 295 F. Supp. 2d at 170.  In sum, this Court has previously referred to Rule 9(b)'s requirements as setting forth the "'who, what, when, where, and how' of the alleged fraud."  *Karvelas*, 2003 U.S. Dist. Lexis 8846, at *13 (quoting *United States ex rel. Gublo v. Novacare, Inc.*, 62 F. Supp. 2d 347, 354 (D. Mass. 1999)).

The Complaint does exactly that.  Specifically, the Complaint alleges that Defendants falsely marketed and promoted Celebrex in an effort to create demand for the drug as a wide-ranging pain reliever, allowing defendants to sell it at a premium over other NSAIDs.  ¶¶ 7, 9. Although Defendants were well-aware that Celebrex had no proven superiority over other NSAIDs, that the FDA had refused to approve Celebrex for the management of acute pain, and that Celebrex had serious gastrointestinal, cardiovascular, and skin reaction side-effects, defendants nonetheless promoted it as a superior pain reliever, falsely advertising its safety and efficacy while concealing its life-threatening side effects.  ¶¶ 57, 152.  Defendants blitzed doctors' offices with fraudulent literature and verbal presentations, and they each used the U.S. Mails and Interstate Wire Facilities on thousands, if not hundreds of thousands, of occasions to direct false and misleading materials to governmental agencies, doctors, consumers, health care providers, and others throughout the country.  ¶¶ 72-83, 184.  Although Plaintiffs are unable to allege the precise dates of each communication, such matters are peculiarly within Defendants' knowledge. "Indeed, an essential part of the successful operation of the Celebrex Enterprise alleged herein

depended upon secrecy, and as alleged above, Defendants took deliberate steps to conceal their wrongdoing." ¶ 183.

Defendants seize upon the complaint's lack of allegations of precise dates of and the specific participants in these communications as grounds to dismiss. But in response to the same argument, the *Lupron* court refused to grant defendants' motion to dismiss, quoting at length from the First Circuit's decision in *Becher*, 829 F.2d at 290-91, where the plaintiffs plausibly pled a fraudulent scheme but were unable to specify each defendant's use of interstate mail or wire. *In re Lupron*, 295 F. Supp. 2d at 170-71. Plaintiffs' allegations of a fraudulent scheme that was both plausible and concealed led the First Circuit to relax the Rule 9(b) pleading standard:

> Where there are multiple defendants, as here, and where the plaintiff was not directly involved in the alleged transaction, the burden on the plaintiff to know exactly when the defendants called each other or corresponded with each other, and the contents thereof, is not realistic. Plaintiff here provided an outline of the general scheme to defraud and established an inference that the mail or wires was used to transact this scheme; requiring plaintiff to plead the time, place and contents of communications between the defendants, without allowing some discovery, in addition to interrogatories, seems unreasonable. [*Becher*, 829 F.2d at 291.]

And thus, under the circumstances herein, where only Defendants know the details of their fraud and Plaintiffs have had no opportunity to conduct discovery, courts in this Circuit do not require greater specificity lest they permit sophisticated defrauders to successfully conceal the details of their fraud and avoid liability. Defendants cannot, and do not, contest the fact that they are on notice of the precise misconduct with which they are charged. Moreover, as Defendants do not dispute in their motion, Plaintiffs have pled a plausible scheme to defraud that used interstate mails and wire. The standard set forth in *Becher*, *Boston & Maine Corp.*, and *Lupron* has been met. The Complaint must be sustained.

Defendants' authorities do not compel a contrary result. In *Ahmed v. Rosenblatt*, 118 F.3d 886 (1st Cir. 1997), for example, the *pro se* plaintiff failed to plead any of the three elements of his RICO claim. *Id*. at 889. The court was hence ill disposed to grant plaintiff leeway

under Rule 9(b) to allow him discovery for the sole purpose of pleading defendant's predicate acts with greater particularity.  *Id*. at 890.  *See also Rhone v. Energy North, Inc.*, 790 F. Supp. 353, 358-61 (D. Mass. 1991) (same).[3]  In *Cordero Hernandez v. Hernandez Ballesteros*, 333 F. Supp. 2d 6, 11-12 (D.P.R. 2004), the court had previously given plaintiff three years to conduct discovery into defendants' alleged predicate acts, which it deemed a sufficient opportunity for plaintiff to plead the acts with particularity.  The plaintiff in *White v. Union Leader Corp.*, 2001 U.S. Dist. Lexis 24516, at *17-19, 2001 DNH 126, 2001 WL 821527 (D.N.H. July 13,  2001), likewise had ample access to evidence of defendants' predicate acts.  Here, by contrast, Plaintiffs only recently filed this case and have obtained no discovery from Defendants.  Evidence of Defendants' predicate acts thus remains in Defendants' sole possession.

**C.    Plaintiffs Have Stated Proper Claims Under Each State Consumer Protection Statute**

Plaintiffs have alleged proper claims under the consumer fraud statutes of New Jersey, Massachusetts, and Arizona, and they are entitled to conduct discovery to uncover further evidence in support of each claim.  As set forth below, the well-pleaded facts in the Complaint adequately set forth defendants' violation of each state's consumer fraud statute.

**1.    Defendants Violated New Jersey's Consumer Fraud Act**

The allegations in the Complaint set forth a clear relationship between Defendants' unlawful conduct and Plaintiffs' ascertainable losses, thereby satisfying the causation requirement in New Jersey's Consumer Fraud Act ("NJCFA").  The Court should reject Defendants' arguments to the contrary, as they are based upon a narrow reading of the Complaint and factually inapposite authorities.

"The causation provision of [the NJCFA] requires plaintiff to prove that the unlawful consumer fraud caused his loss."  *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 464 (N.J. Sup. Ct.

---

[3] *Rhone* also failed even to mention the relaxed Rule 9(b) pleading standard for RICO predicate acts.  *See id*. at 360.

1994).  New Jersey courts view causation as a question of proximate cause.  *Ramanadham v. New Jersey Mfrs. Ins. Co.*, 455 A.2d 1134, 1136 (N.J. Super. Ct. App. Div. 1982); *Perez v. Wyeth Labs.*, 734 A.2d 1245, 1252 (N.J. Sup. Ct. 1999).  Proximate cause is a flexible concept that may change to fit the circumstances of each case.  It is "that combination of logic, common sense, justice, policy and precedent that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery."  *Perez*, 734 A.2d at 1261 (citations and internal quotations omitted).  A proximate cause need not be the sole cause of harm, so long as it is a substantial contributing factor to the harm suffered.  *Id.*  Consequently, absent "unique" or "highly extraordinary" circumstances, "issues of proximate cause are considered to be jury questions."  *Id.*

In examining the issue of proximate cause, the Court should begin by considering whether Defendants' conduct "can be considered sufficiently causally connected to [the] harm so as to justify the imposition of liability."  *Brown v. United States Stove Co.*, 484 A.2d 1234, 1243 (N.J. Sup. Ct. 1984).  This analysis should take into account "concerns for overall fairness and sound public policy."  *Id.*; *see also Contey v. New Jersey Bell Tel. Co.,* 643 A.2d 1005, 1008 (N.J. Sup. Ct. 1994).  The causation analysis is not a question of tracing the links in a chain of events.  Rather, it is a determination, grounded upon policy, justice, and fairness, of whether the cause and its effect are sufficiently "proximate" to one another that the Court will afford redress for the harm.

The cause and effect relationship must exist between Defendants' conduct in violation of the NJCFA and the inflated prices plaintiffs paid when purchasing Celebrex.  Plaintiffs' allega-tions establish that causal connection.  The Complaint plainly alleges that Defendants falsely marketed and promoted Celebrex in an effort to create demand for the drug as a wide-ranging pain reliever.  ¶¶ 5-8, 85-90.  Although they were well-aware that Celebrex had no proven superiority over other NSAIDs, that it had serious cardiovascular side effects, and that the FDA had refused to approve the promotion of Celebrex as more effective than other NSAIDs in

preventing clinically serious GI events, Defendants nonetheless promoted Celebrex as having "excellent GI tolerability" and suppressed data exposing its risks and dangers.  ¶¶ 39, 80, 143-50. Defendants directed their marketing efforts at governmental agencies, doctors, consumers, health care providers, and others throughout the country and, unfortunately, Defendants' efforts paid off.  ¶¶ 72-90, 184.  Demand for Celebrex skyrocketed, and the increased demand allowed Defendants to sell the drug at a premium over other NSAIDs – a premium paid by Plaintiffs and the Class.  ¶¶ 7, 9, 85-90.

Defendants' argument that there is no sufficient causal link between their conduct and Plaintiffs' ascertainable losses is simply wrong.  In fact, a New Jersey appellate court recently rejected the very same arguments made by defendants herein.  In *DeLima v. Exxon Corp.*, slip op., No. A-3536-99T3 (N.J. Super. Ct. App. Div. Dec. 4, 2000) (a copy is attached hereto as Exhibit A), the plaintiffs alleged that Exxon had engaged in a misleading advertising campaign that falsely touted its high-octane gasoline, 93 Supreme, as keeping car engines cleaner than competing or less expensive gasolines.  *Id*. at 3-4.  The false and misleading advertising campaign was alleged to have driven up the price of Exxon's high-octane gasoline, thereby damaging the class comprised of New Jersey consumers who purchased the gasoline during the period of the advertising campaign and thereby paid an inflated price.  Not surprisingly, there was a broad range of exposure to the allegedly false advertising among class members, from plaintiffs who had not seen the advertising to those who saw the ads but had not changed their preexisting purchasing behavior as a result.  *Id*. at 4-5.

Predictably, defendants attacked the plaintiffs' theory as failing to allege sufficient causation between the allegedly false advertising and the ascertainable loss plaintiffs claimed to have suffered.  The trial court and appellate court rejected defendants' attack on what was termed the "price inflation theory," accepting it as providing the link between the misleading advertising and ascertainable loss required by the NJCFA:

> If [plaintiff's expert] Latham is correct, the [plaintiff] paid more
> for 93 Supreme than he would have if defendant had not engaged
> in false advertising. [Plaintiff's] loss would be the difference
> between the price he paid for the gasoline and what the gasoline
> would have cost without the advertising. [*Id*.]

In *DeLima*, the Appellate Division distinguished *Kaufman v. I-Stat Corp*., 754 A.2d 1188 (N.J. Sup. Ct. 2000), from a false-advertising case under the NJCFA. It noted that in *Kaufman*, the supreme court rejected the "fraud on the market" theory where the plaintiffs had attempted to use it to establish reliance in a common-law fraud action. *Id*. at 1200-01. The *DeLima* court identified the clear distinction between common-law fraud (requiring reliance) and statutory fraud under the NJCFA (requiring causation, but not reliance). Because the significance of the *Kaufman* decision lay in its rejection of the "fraud on the market" theory in lieu of proof of reliance on a common-law fraud claim, the appellate division held that *Kaufman* was irrelevant to its analysis of the statutory fraud claims set forth by the *DeLima* plaintiffs. *Kaufman* thus has no bearing on a statutory fraud claim under the NJCFA and does not require dismissal of the Plaintiffs' claim herein.

Earlier this year, the New Jersey Supreme Court reconfirmed that a plaintiff suing under the NJCFA has a right to damages equal to the difference between the price paid and the actual value of the goods. *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 795 n.8 (N.J. Sup. Ct. 2005). The court noted that such "benefit-of-the-bargain" claims can "support an ascertainable loss sufficient to allow a CFA claim to proceed to the factfinder." *Id*.; *see also Furst v. Einstein Moomjy, Inc.*, 860 A.2d 435, 441-42 (N.J. Sup. Ct. 2004). This recent statement of the law makes it clear that plaintiffs, who seek damages equal to the difference between the price that they paid for Celebrex and its actual market value, are entitled to maintain the present action.

Defendants' reliance on *Heindel v. Pfizer, Inc.*, 2004 U.S. Dist. Lexis 12232 (D.N.J. June 7, 2004), is unavailing. Putting aside the fact that it is not binding on this Court, it also is factually inapposite. *Heindel* involved claims for violation of the NJCFA and for breach of the implied warranty of merchantability arising out of the purchase and use of Celebrex. *Id*., at *41-

47.  Unlike here, the *Heindel* plaintiffs had no evidence that Celebrex had been ineffective.  *Id.*, at *42.  But the allegations in the present Complaint are the opposite, demonstrating that Celebrex was not, as Defendants promised, a superior and effective pain reliever, among other things.  The other case referred to by Defendants, *New Jersey Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174 (N.J. Super. Ct., App. Div. 2003), is equally inapposite.  *New Jersey Citizen Action* involved consumer fraud claims related to the marketing of the drug Claritin.  *Id.* at 175. The only marketing at issue therein, however, was "direct-to-consumer" marketing.  *Id.* at 176. Accordingly, that court determined that the intervention of a physician would sever the causal connection.  But where, as here, the fraudulent marketing and other statements were directed to physicians as well as consumers, and physicians were equally mislead about the safety and efficacy of Celebrex, the court's reasoning is inapplicable.  Therefore, Defendants' arguments must fail.

Ultimately, "[t]he Consumer Fraud Act is remedial legislation that [courts] construe liberally to accomplish its broad purpose of safeguarding the public."  *Furst*, 860 A.2d at 441.  It is well established that the legislature intended for the NJCFA to have liberal standards of proof. The clearest statement of what constitutes a claim under the NJCFA is in the statute itself.  The NJCFA states, in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false pro- mise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful act.  [N.J.S.A. 56:8-2.]

The NJCFA was enacted in 1960 "in response to widespread complaints about selling practices which victimized consumers."  *Sickles v. Cabot Corp.*, 2005 N.J. Super. Lexis 217, at *24 (App. Div. July 7, 2005) (quoting *Fenwick v. Kay American Jeep, Inc.,* 371 A.2d 13, 15 (N.J. Sup. Ct. 1997)).  "The language of the [NJCFA] evinces a clear legislative intent that its

provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." *Lemelledo v. Beneficial Mgmt. Corp.*, 696 A.2d 546, 551 (N.J. Sup. Ct. 1997); *see also Sickles*, 2005 N.J. Super. Lexis 217, at *18. The principles promulgated by the NJCFA, as well as New Jersey law, support the conclusion that Plaintiffs state a valid NJCFA claim.

> ### 2.    Defendants Violated Massachusetts' Consumer Fraud Act

Plaintiffs have also stated a valid claim under the Massachusetts Consumer Fraud Act. Plaintiffs' February 16, 2005 demand letter, sent pursuant to M.G.L. 93A, § 9(3), states as follows: "We have been retained to represent Health Care for All and its membership *and Judy Meredith*…. We make this demand on behalf of our client(s) in their individual capacities and as representatives of a proposed class of persons and entities in Massachusetts who purchased Celebrex® (i.e., paid some or all of the purchase price) other than for resale." Sobol Decl., Ex. D (emphasis added). Defendants have acknowledged their receipt of, and the sufficiency of, this letter. As required by M.G.L. 93A, § 9(3), the demand letter identifies the claimants herein and reasonably describes the unfair and deceptive acts and practices relied upon and the injury suffered. Therefore, Defendants' claim that they have not received a 93A demand letter from Ms. Meredith is simply false, and all of their arguments in this regard must fail. Although the Complaint does not contain any specific allegations pertaining to the demand letter, Defendants' concession that they received a proper demand letter is sufficient to satisfy M.G.L. 93A, § 9(3). *See Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 286, 475 N.E.2d 727 (1985); *Slaney v. Westwood Auto., Inc.*, 366 Mass. 688, 704, 322 N.E.2d 768 (supreme judicial court of mass. 1975). The purposes of a demand letter are to encourage negotiation and operate as a control on damages. *Slaney*, 322 N.E.2d at 704. Where, as here, Defendants themselves admit receipt of the letter, and the purposes of the statute are clearly met, there is no justification for dismissing an otherwise valid claim. This is undoubtedly why Defendants' own authorities make it plain that dismissal is proper only where a plaintiff fails to "allege *and prove* the existence of a demand letter." *Spring*, 475 N.E.2d at 735 (emphasis added). In other words, because the

existence of the demand letter will not be an issue in this case, the absence of allegations to that effect is irrelevant.

Defendants' only other argument – that Plaintiffs have failed to allege that their damages were proximately caused by Defendants' conduct – is misguided for several reasons. First, as discussed above, Defendants' request for dismissal on proximate cause grounds ignores the well-established rule that "[q]uestions of proximate cause … are generally left to the jury for its factual determination." *Gloulet v. Actionvest Mgmt. Corp.*, No. 00-1310, 2002 Mass. Super. Lexis 291, at *17 (Super. Ct., Aug. 1, 2002). Defendants' conclusory statement that "[t]he Individual Plaintiffs have failed to allege causation" comes nowhere close to justifying dismissal at this early stage. *See* Defs. Br. at 11. Second, Defendants ignore the relevant legal standard. To establish causation under M.G.L. 93A, § 9(3), "a plaintiff need not prove actual reliance on the deceptive statements. Rather, causation is established if an act could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Deane v. Snelling & Snelling Personnel Servs.*, 1997 Mass. Super. Lexis 250, at *11-12 (Mass. Super. Ct., May 8, 1997) (internal citations omitted); *see also Grossman v. Waltham Chem. Co.*, 14 Mass. App. Ct. 932, 436 N.E.2d 1243, 1245 (1982) (causation is established where an omitted fact ***may*** have caused plaintiff to refrain from purchasing the property). The question herein is therefore whether it would be reasonable to conclude that Defendants' misrepresentations ***might*** have caused Plaintiffs to purchase Celebrex. Putting aside the fact that such an inquiry raises quintessential questions of fact that cannot be determined at this stage, it is beyond dispute that a reasonable jury could reach such a conclusion.

Defendants' fraudulent promotion of Celebrex as having "excellent GI tolerability," and their suppression of data concerning serious cardiovascular side effects, could reasonably be found to have caused Plaintiffs to purchase Celebrex. Stated differently, it would be reasonable to conclude that Plaintiffs might not have purchased Celebrex had they known that it was no more effective than a 10¢ aspirin and it had serious cardiovascular side effects. In that case,

Plaintiffs would have avoided paying any portion of the inflated price of Celebrex, whether through a co-pay or otherwise, and would have suffered none of the damages complained of herein. Contrary Defendants' suggestion, Plaintiffs' allegations in this regard are far from conclusory. Rather, taken as a whole and viewed in the light most favorable to Plaintiffs, the allegations in the Complaint satisfy the standard under Massachusetts law, and even go so far as to demonstrate Plaintiffs' actual reliance on Defendants' misrepresentations. As such, Defendants' motion to dismiss Plaintiffs' claim under the Massachusetts Consumer Fraud Act must be denied.

### 3. Defendants Violated Arizona's Consumer Fraud Act

Under Arizona law, Plaintiffs' reliance on Defendants' misrepresentations, and therefore the requirement of causation, is established by the fact that they purchased Celebrex. *Siemer v. Assocs. First Capital Corp.*, 2001 U.S. Dist. Lexis 12810, at *14-15 (D. Ariz. Mar. 29, 2001). In *Siemer*, plaintiffs alleged that members of their proposed class were harmed by defendants' insurance sales both because the product itself was flawed and because it was sold in a misleading and ambiguous manner. *Id*., at *11. Although the *Siemer* court recognized that reliance was necessary, it stated (in ruling on plaintiffs' motion for class certification, where the issue of reliance is more heavily scrutinized) as follows:

> Plaintiffs are seeking certification of a state-wide class concerning Associates' scheme of selling credit life insurance pursuant to a deceptive standardized form. In order to be a member of the class, a Plaintiff must have been "sold credit life insurance in connection with any real estate loan made by Associates that will not pay off the loan in the event of their death during the term of coverage." The [Arizona Consumer Fraud Act] requires that Plaintiffs demonstrate a proximate cause between their injuries and the damages suffered due to their reliance on Defendants' misrepresentations. Under the proposed definition defining the class, a person cannot be a plaintiff unless that person was sold the insurance. Therefore, in order to even join the class, a party must show that he or she relied on Associates' alleged misrepresentations. Plaintiffs have sufficiently demonstrated reliance by their purchase of credit life insurance. This alone is sufficient to show reliance to the degree necessary under the [Arizona Consumer Fraud Act]. In addition, the Court need not evaluate the reasonable-

> ness of the Plaintiffs' reliance because under the statute, reliance does
> not have to be reasonable.

*Id.*, at *14-15.

Applying this standard, the Complaint must be sustained because the proposed class herein is composed only of those who purchased Celebrex. Even under more rigorous scrutiny, however, the Complaint must still survive. In addition to Plaintiffs' own allegations concerning widespread reliance on Defendants' misrepresentations, the success of Defendants' advertising scheme was recently documented in a study released on January 24, 2005 in the *Archives of Internal Medicine*, Vol. 165, entitled *National Trends in Cyclooxygenase-2 Inhibitor Use Since Market Release*, wherein the authors of that study concluded that "aggressive marketing techniques to patients and physicians" caused a growth not only in use of COX-2 inhibitors but also in overall market demand, resulting in the use of such drugs for patients who did not need them. Although Defendants ask the Court to ignore this and Plaintiffs' other well-pled facts, including the specific allegation that Plaintiffs were "deceived by Defendants' misrepresentations," doing so would be improper at this stage of the proceedings. ¶ 207. The inquiry at this stage is not whether Plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims, and in this case Plaintiffs have set forth more than sufficient allegations to allow their claim to go forward. Therefore, Defendants' motion to dismiss Plaintiffs' claim for violation of Arizona's Consumer Fraud Act must fail.

**D.      Plaintiffs Have Stated a Proper Claim for Unjust Enrichment**

Defendants cite no authority for their novel proposition that Plaintiffs cannot maintain an action for unjust enrichment to recover funds they overpaid as a result of Defendants' fraudulent marketing of Celebrex and, after careful review, such authority does not appear to exist. Unjust enrichment is an equitable doctrine that prevents one party from unjustly retaining the money or property of another where equity and good conscience demand its return. In the present case, Defendants' false marketing and promotion of Celebrex created demand for the drug, which in turn allowed them to sell it for a premium over other NSAIDs. When Plaintiffs purchased

Celebrex, however, they did not receive a superior drug as promised. Celebrex was neither a superior pain reliever, nor was it safer or more effective than other NSAIDs. Instead, in exchange for their premium payments, Plaintiffs received the equivalent of a 10¢ aspirin. Overall, Plaintiffs and the Class paid, and Defendants received, hundreds of millions of dollars as a result of Defendants' fraudulent marketing scheme. Equity and good conscience demand the return of these funds.

In a similar situation, a district court recently allowed a group of plaintiffs to maintain an action for unjust enrichment for alleged "over payments" they made in purchasing a pioneer potassium chloride supplement manufactured by defendants therein. *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544-46 (D.N.J. 2004). Specifically, plaintiffs sought to recover "the actual cost of [the drug] itself, not outlays made for medical coverage of health risks associated with [the drug]." *Id.* at 545. In denying defendants' motion to dismiss, the court rejected the argument that plaintiffs' receipt of valuable medicine for their payments negated their claim. *Id.* at 545. The court further clarified that the benefit conferred on defendants need not mirror plaintiff's loss. *Id.* at 544. "The critical inquiry is whether the plaintiff's detriment and the defendant's benefit are related to, and flow from, the challenged conduct." *Id.*

As discussed above, Plaintiffs' damages stem directly from Defendants' conduct – *i.e.*, their false and misleading marketing of Celebrex. Since Defendants' arguments are contrary to well-established law, they should be rejected, and defendants' motion to dismiss Plaintiffs' unjust-enrichment claim should be denied.

## V.    CONCLUSION

For the reasons set forth herein, the Court should deny Defendants' motion to dismiss the individual Plaintiffs' claims.

DATED:  July 27, 2005

HAGENS BERMAN SOBOL SHAPIRO LLP


By /s/ Thomas M. Sobol
      Thomas M. Sobol
One Main Street, Fourth Floor
Cambridge, MA  02142
(617) 482-3700
tom@hbsslaw.com

Steve W. Berman
Erin K. Flory
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292
steve@hbsslaw.com
erin@hbsslaw.com

Garve Ivey, Jr.
Barry A. Ragsdale
William Adair, Jr.
IVEY & RAGSDALE
P.O. Box 1349
315 West 19th Street
Jasper, AL 35502-1349
(205) 221-4644
garve@iveyragsdale.com

Jonathan B. Lowe
LOWE MOBLEY & LOWE
P.O. Box 576
Haleyville, AL 35575-0576
(205) 486-5296

Jeffrey Kodroff
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 496-0300

*Attorneys for Plaintiffs and the Proposed Class*

# EXHIBIT A

Jul-31-2001 03:18pm From-WILENTZ          732-855-6117        T-748  P.002/017  F-235

~09-2-5397

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
A-3536-99T5

LUCINDA P. DeLIMA and
ADAM TIETCHEN, on behalf
of themselves and all
others similarly situated,

    Plaintiffs-Respondents,

v.

EXXON CORPORATION,

    Defendant-Appellant.

Argued November 8, 2000 — Decided DEC 4 2000

Before Judges Conley, Wecker and Lesemann.

On appeal from the Superior Court of New Jersey,
Law Division, Hudson County.

Stephen J. Harburg (O'Melveny & Myers) of the Washington,
D.C., bar admitted pro hac vice, argued the cause for
appellant (McCusker, Anselmi, Rosen, Carvelli & Walsh, and
Stephen J. Harburg and Jonathan L. Griffith (O'Melveny &
Myers), attorneys; Mr. Harburg and Mr. Griffith, of counsel;
Joseph T. Walsh, III, and Paul F. Carvelli, on the brief).

Bruce D. Greenberg argued the cause for respondents
(Lite, DePalma, Greenberg, & Rivas, attorneys;
Mr. Greenberg and Mary Jean Pizza, on the brief).

Skadden, Arps, Slate, Meagher & Flom, attorneys for amicus
curiae Product Liability Advisory Council (Sheila L.
Birnbaum, Douglas W. Dunham and Ellen P. Quackenbos, of
counsel; Robert J. Del Tufo, on the brief).

Jul-31-2001  03:19pm  From-WILENTZ                    732-855-6117          T-748  P.003/017  F-235
                                                                              1973691154  P.3/17

PER CURIAM

In this common law fraud and Consumer Fraud Act litigation,
plaintiffs Lucinda DeLima and Adam Tietchen allege that defendant
Exxon Corporation conducted an advertising campaign falsely
claiming its "93 Supreme" gasoline kept engines cleaner, reduced
maintenance costs and increased performance. On their motion for
class certification, plaintiff Tietchen was certified as a class
representative of all those who bought 93 Supreme during the
relevant time period even if they had not relied on the
advertising, both as to the common law fraud and statutory
consumer fraud claims.[1] By leave granted, Exxon appeals that
class certification.

The controversy here concerns, primarily, R. 4:32-1(b)(3).
At the outset, we observe that "[i]mplicit in the determinations
of predominance and superiority [see R. 4:32-1(b)(3)] is an
identification of the relevant factual and legal issues. The
mere identification of those issues, however, is less penetrating
than their subsequent evaluation on a motion for summary judgment
or at trial." In re Cadillac V8-6-4 Class Action, 93 N.J. 412,
426 (1983). Thus, "[c]ertification of a class action should not
be denied because of the underlying theory on which the action is

_____

[1] The motion also sought to certify DeLima as a class
representative of all those who bought 93 Supreme directly
relying upon the advertisements. The motion judge concluded a
predominance of common questions of fact or law did not exist as
to each member's specific direct reliance upon the
advertisements. See R. 4:32-1(b)(3). That ruling is not before
us.

2

Jul-31-2001  03:19pm  From-WILENTZ                732-855-6117              T-748  P.004/017  F-235

predicated." _Ibid._ The motion judge is required only to make
"some preliminary analysis" of the legal and factual issues to
ensure they are not "patently frivolous." _Ibid._; _Olive v._
_Graceland Sales Corp._, 61 _N.J._ 182, 189 (1972). We ought not,
moreover, reverse a trial judge's decision regarding
certification of a class absent an abuse of discretion. _In re_
_Cadillac V8-6-4 Class Action_, _supra_, 93 _N.J._ at 436. _See_
_Varacallo v. Massachusetts Mut. Life Ins. Co._, 332 _N.J. Super._
31, 42 (App. Div. 2000). The substantive allegations in the
complaint must be accepted as true, _DelRosso v. Kenny_, 266 _N.J._
_Super._ 169, 181 (App. Div. 1993), and, it has been said,
"[p]laintiffs' chances of succeeding on the merits are
irrelevant." _Gross v. Johnson & Johnson-Merck Consumer Pharm._
_Co._, 303 _N.J. Super._ 336, 341 (Law Div. 1997).

The facts viewed most favorably for plaintiffs are as
follows. Exxon is the largest producer and seller of gasoline in
the United States. In May 1995, Exxon began to market a new
formulation of gasoline, including 93 Supreme. Advertisements
for 93 Supreme claimed that it had "the power to drive down
maintenance costs," it "keeps your engine cleaner," "can save you
money," and provides "more reliable performance." 93 Supreme
could cost as much as twenty cents a gallon more than other
gasolines. Exxon's advertising claims for 93 Supreme were either
"false or unsubstantiated and misleading." 93 Supreme does not,
in any appreciable measure, keep the engine cleaner, reduce

3

Jul-31-2001 03:20pm  From-WILENTZ                    732-855-6117        T-748  P.005/017  F-235

maintenance costs, save money or provide more reliable performance than other competing or less expensive gasolines.[2]

Tietchen has purchased defendant's 93 Supreme gasoline since 1972. He began using high octane gas because his father and uncle taught him that it was better. Tietchen saw defendant's advertisements about 93 Supreme on television and heard them on radio. These advertisements did not change Tietchen's purchasing decisions but they did reinforce his views on the superiority of high octane fuel.

In support of their motion for class certification, plaintiffs submitted the certification of Dr. William Latham III, a professor of economics at the University of Delaware. In rendering his opinion, Latham assumed that the allegations in plaintiffs' complaint were true. Latham stated that there was a significant price differential of at least $0.10 a gallon between 93 Supreme and defendant's other nonpremium gasolines during the relevant time period. Latham concluded:

> Assuming for present purposes the validity of this claim [of false advertising], then there exists a strong economic likelihood that a substantial part of the price differential between 93 Supreme and the other grades of Exxon gasoline was the result of the greater

---

[2]Indeed, in September 1996 the Federal Trade Commission (FTC) announced that it would charge Exxon with violating the Federal Trade Commission Act as a result of its marketing campaign for 93 Supreme. The FTC charged that Exxon had misled consumers by making unsubstantiated claims that its gasolines, including 93 Supreme, could clean engines and reduce maintenance costs.

4

demand for 93 Supreme gasoline caused by the
misleading advertisements for the 93 Supreme
gasoline, a necessary result of the fact that
[t]he misleading advertising led some
consumers to demand 93 Supreme creating an
increase in demand that permitted Exxon to
maintain a higher price for its 93 Supreme
gasoline.

In certifying the complaint as a class action as to the
Consumer Fraud Act claim, the motion judge concluded that
Latham's theory that the false advertising created higher demand
which, in turn, sustained a higher price and thus Tietchen and
all others who purchased 93 Supreme during this period suffered
an ascertainable loss because of the artificially inflated price,
was, at least for the purposes of the class certification motion,
sufficient to pass the "preliminary analysis" test.

The judge also found that class certification as to the
common law fraud claims was appropriate.  In analyzing the common
legal and factual issues as required pursuant to R. 4:31-1(b)(3),
critical focus was upon Tietchen's ability to establish the
common law fraud element of reliance upon the various
advertisements.  Since Tietchen, himself, had not bought 93
Supreme in reliance upon the advertisements, the "preliminary
analysis" test as to the common law fraud certification was more
difficult.  Relying upon our decision in Kaufman v. I-Stat Corp.,
324 N.J. Super. 344 (App. Div. 1999) (subsequently reversed by
the Supreme Court), the judge found that the  the theory of
indirect reliance upon the integrity of the gasoline market could
be resorted to.  The judge analogized the instant case to

5

securities cases which have utilized the concept of "fraud on the
market" to establish the necessary reliance and as we also did in
Kaufman.

In denying Exxon's motion for reconsideration which focused
upon the Consumer Fraud Act class certification, the judge
rejected Exxon's argument that individual factual issues would
predominate because plaintiffs' proofs at trial would need to
include evidence on individual gas purchases at all 420 Exxon
gasoline stations in New Jersey. He said:

> In this case with respect to the
> predominance issue defendants argue, as
> indicated, that . . . plaintiff's proofs at
> trial will require a focus on individual gas
> purchase transactions in 420 independent
> Exxon gasoline stations during the class
> period. . . . as I did review, in the
> certification of Dr. Latham, again, I do not
> find that that is likely to be the case . . .
> Dr. Latham['s] . . . certification suggests
> that proofs will indicate that the claimed
> benefits of higher octane over lower octane
> were not true, and that if that is the case
> consumers of retail gasoline products follow
> the same laws as consumers generally, in that
> consumers wouldn't pay for added value if
> they weren't getting added value. I'm
> satisfied that his affidavit is a very
> strong indication that the proofs will be of
> a generalized nature. That is not to say
> that the discovery is not going to be highly
> particularized, but I see no reason to
> anticipate that at trial this matter will be
> unmanageable because of the particularity of
> the proofs that plaintiffs will be obliged to
> produce. Looking, again, at Dr. Latham's
> affidavit and the opposing affidavit it seems
> clear to me that all the opposition does is
> attack the merits of the theory. The
> defendant's affidavit says Latham's premise
> is false. That's an issue to be decided at
> time of trial. It's not the opposition that

6

Jul-31-2001  03:22pm  From-WILENTZ                    732-855-6117         T-748  P.008/017  F-235

warrants denying . . . this matter proceeding
as a Class Action. This Court has previously
determined that defendant's assertions
regarding the nature of retail gasoline
pricing and the effects of advertising should
not forestall plaintiffs from proceeding on a
Class Action basis.  Plaintiffs should be
given an opportunity to conduct discovery, if
it has not been concluded, and to develop
their proofs on the basis of Class claims.
The allegations of the complaint and the
supporting affidavits . . . are a
sufficient basis to warrant going forward on
that basis.

    After an appropriate opportunity to
develop proofs, nothing prevents defendants
from filing a motion to decertify.  I believe
this procedure is consistent with Chief
Justice Weintraub's admonition that the
remedy in these actions should be attended by
the ingenuity characteristic of equity, and
that the certification rule should be applied
liberally to the end that the claims of a
Class Action may be achieved, if it is
possible to do so with fairness to the
litigants.  At this juncture I am satisfied
that the Class Action is manageable and can
be conducted with fairness to all of the
parties.  The motion is denied.

In this appeal, Exxon contends the motion judge erroneously
applied the "fraud on the market" presumption of reliance in
concluding that that aspect of a common law fraud claim could be
established.  Exxon further contends that the judge erred in
certifying Tietchen as a class representative regarding the
statutory consumer fraud claim because plaintiffs failed to
establish a causal link between the false advertising and
Tietchen's loss.  Finally, Exxon contends that common factual and
legal issues do not predominate and that the motion judge

7

Jul-31-2001 03:22pm  From-WILENTZ                    732-855-6117            T-748  P.009/017  F-235

erroneously rejected its claim that class litigation will degenerate into a multitude of unmanageable mini-trials.

We have considered the contentions. We are convinced the motion judge did not abuse his discretion in rejecting Exxon's contention of a multiplicity of factual issues, at least at this early stage of the proceeding. We see no further necessity to address that issue beyond what the motion judge said below. R. 2:11-3(e)(1)(E). We address in more detail first the causal link issue in connection with the Consumer Fraud Act claim and second the "fraud on the market" indirect reliance issue in connection with the common law fraud claim.

The Consumer Fraud Act provides in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . _whether or not any person has in fact been misled, deceived or damaged thereby_, is declared to be an unlawful practice . . . .

[_N.J.S.A._ 56:8-2 (emphasis added).]

Reliance, then, is not a necessary element of a Consumer Fraud Act cause of action premised upon false advertisements. _Gennari v. Weichert Co. Realtors_, 148 _N.J._ 582, 607-08 (1997); _Varacallo v. Massachusetts Mut. Life Ins. Co._, supra, 332 _N.J. Super._ at 43. The Act only applies to a "person who suffers any

8

ascertainable loss of moneys or property, real or personal, _as a result of_ the use or employment by another person of any method, act, or practice declared unlawful under this act . . . . _N.J.S.A._ 56:8-19 (emphasis added). Thus, Tietchen must be able to establish a causal link between the alleged unlawful conduct and the loss. _Meshinsky v. Nichols Yacht Sales, Inc._, 110 _N.J._ 464, 473 (1988); _Varacallo v. Massachusetts Mut. Life Ins. Co._, _supra_, 332 _N.J. Super._ at 43.

Here, in engaging in the "preliminary analysis" of this issue and accepting Tietchen's proofs, the motion judge found that the causation requirement was met by the certification of Latham, Tietchen's economist, who concluded that 93 Supreme's higher price was a result of greater demand for the premium gasoline brought about by the misleading advertisements. If Latham is correct, then Tietchen, the class representative, paid more for 93 Supreme than he would have if defendant had not engaged in false advertising. Tietchen's loss would be the difference between the price he paid for the gasoline and what the gasoline would have cost without the advertising.

While this theory may seem somewhat tenuous, we agree with the motion judge that it is enough to survive the class motion motion. Indeed, this price inflation theory of causation has been recognized in other cases. _See Oliveira v. Amoco Oil Co._, 311 _Ill. App._ 3d 886, 726 _N.E.2d_ 51, _appeal allowed_, 189 _Ill._ 2d 690, 734 _N.E.2d_ 895 (2000). There, plaintiff Oliveira appealed

9

Jul-31-2001 03:24pm    From-WILENTZ                    732-855-6117              T-748  P.011/017  F-235

the denial of class certification of consumers both outside and
inside Illinois who had purchased Amoco premium gasoline, whether
or not they had actually seen Amoco's misleading advertisements.
The class certification was premised upon claims of unlawful
conduct under Illinois's consumer fraud act which is similar to
our Act.   One of Amoco's defenses on appeal was that the class
representative could not establish the necessary causation.   The
Illinois Court of Appeals rejected this contention primarily
based upon a certification of the plaintiff's economist, Dr.
Latham, the economist in the instant case.   The court accepted
Latham's theory of a causal link:

> Dr. Latham contends he can isolate the
> variables that go into fueling the demand,
> calculate the amount of the artificially high
> prices during the relevant period
> attributable to the advertising, and then
> calculate the amount plaintiff overpaid,
> therefore showing defendant's misleading
> advertising proximately caused plaintiff and
> anyone else who bought defendant's premium
> gasoline to pay inflated prices.

[Id. at 58.]

See also Weinberg v. Sun Co., Inc., 740 A.2d 1152, 1164, 1170
(Pa. Super. Ct. 1999).

The cases cited by defendant, Stephenson v. Bell Atl. Corp.,
177 F.R.D. 279 (D.N.J. 1997); Carroll v. Cellco Partnership, 313
N.J. Super. 488 (App. Div. 1998); and Gross v. Johnson & Johnson-
Merck Consumer Pharm. Co., supra, 303 N.J. Super. 336, do not
compel a different result. To begin with, as did the trial judge
here as to plaintiff DeLima's proffered class of those consumers

10

Jul-31-2001  03:24pm  From-WILENTZ                    732-855-6117         T-748  P.012/017  F-235

who actually relied upon the false advertisement, the courts in these cases simply recognize the predominance of individual factual issues where reliance is key. That is not particularly helpful here as the Latham theory of a broad based inflated price has nothing to do with actual reliance. Stephenson, Carroll and Gross concerned a different type of causal link—that the consumers were actually induced to buy the product based on the various alleged unlawful conduct. Stephenson, supra, 177 F.R.D. at 283-94; Carroll, supra, 313 N.J. Super. at 502-03; Gross, supra, 303 N.J. Super. at 389. Illustrative of the evidential problems raised in those cases is the following observation in Carroll:

> Plaintiffs must first identify the same or similar representations that were made to the entire class. This analysis includes a review of multiple different contracts, brochures and other publications, advertisements, and oral representations made by defendant's representatives before purchase of the cellular telephone services and plaintiffs' exposure to them. Plaintiffs must then prove how these representations or omissions impacted upon each plaintiff, that is, how plaintiffs were induced to purchase defendant's services. If all plaintiffs were parties to one uniform contract, proof of reliance may not be difficult, but when considering the variation in representations made to each plaintiff before purchase, proving reliance becomes extraordinary.
>
> [Carroll v. Cellco Partnership, supra, 313 N.J. Super. at 502-03.]

Similar evidential problems do not exist where the theory of causation is price inflation.

11

Received  Jul-28-2001  12:39pm  From-                    To-WILENTZ 2          Page 012

We reemphasize that at the stage of a class certification motion, the motion judge need only determine, by way of a "less penetrating" analysis, whether the legal and factual issues involved in the underlying claim are "patently frivolous." _In re Cadillac V8-6-4 Class Action_, _supra_, 93 _N.J._ at #26; _Olive v. Graceland Sales Corp._, _supra_, 61 _N.J._ at 189.  That being so, we see no abuse of discretion in granting class certification to the Consumer Fraud Act claims.

Finally, we address the class certification of the common law claim.  As we have previously said, the motion judge certified the class primarily premised upon our decision in _Kaufman_, _supra_, and the "fraud on the market" reliance theory. After the motion judge's determination, the Supreme Court reversed our decision in _Kaufman_.  _Kaufman v. I-Stat Corp._, 165 _N.J._ 94 (2000).

In _Kaufman_, _supra_, 165 _N.J._ at 98-99, an investor who purchased securities based on a price inflated by false statements made by the corporation brought a common law fraud action, even though the investor was unaware of the false statements.  We had held that the reliance element of fraud could be supplied through the "fraud on the market" theory.  324 _N.J. Super._ at 349-63.  This was the legal premise for the motion judge's decision here in connection with the common law fraud claim.  The Supreme Court has disagreed and has rejected the use of the "fraud on the market" theory to establish the necessary

12

Jul-31-2001  03:25pm   From-WILENTZ                    732-855-6117        T-748  P.014/017  F-235

element of reliance for common law fraud.  165 N.J. at 118.  The Court explained:

> Accepting fraud on the market as proof of reliance in a New Jersey common-law fraud action would undercut the public interest in preventing forum-shopping, weaken our law of indirect reliance, and run contrary to the policy direction of the Legislature and Congress. We decline to expand our law regarding satisfaction of the reliance element of a fraud action on the basis of a complex economic theory that has not been satisfactorily proven.
>
> [Id. at 118.]

We, of course, are governed by the precedent established by the Supreme Court, and conclude that its rejection of "fraud on the market" to establish reliance in the context of common law fraud is dispositive.

We, therefore, reverse as to the class certification of the common law fraud claim.  We affirm as to the class certification of the Consumer Fraud Act claim.  The matter is remanded for further proceedings.

13

I hereby certify that the foregoing is a true copy of the original on file in my office.

*[signature]*

Clerk

TOTAL P.14

**LITE DePALMA GREENBERG & RIVAS, LLC.**
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
(973) 623-3000
Attorneys for Plaintiffs and the Class

**FILED**

DEC 2 3 1999

ARTHUR N. D'ITALIA, J.S.C.

```
------------------------------X
LUCINDA P. DeLIMA and            : SUPERIOR COURT OF NEW JERSEY
ADAM TIETCHEN, On Behalf of        LAW DIVISION: HUDSON COUNTY
Themselves and All Others Similarly : DOCKET NO.: HUD-L-8969-96
Situated,
                                 :
              Plaintiffs,
                                 :
    vs.
                                 :  ORDER GRANTING
EXXON CORPORATION,                  CLASS CERTIFICATION
                                 :
              Defendant.
------------------------------X
```

This matter having been opened to the Court by Lite DePalma Greenberg & Rivas, LLC,

Bernstein Litowitz Berger & Grossman, LLP, Milberg Weiss Bershad Hynes & Lerach, LLP, and

Phebus & Winkelmann, attorneys for plaintiffs, on a motion for certification of a class of New

Jersey residents pursuant to R. 4:32-1(a) and (b)(3), on notice to McCusker, Anselmi, Rosen,

Carvelli & Walsh, and O'Melveny & Myers, attorneys for defendant, and the Court having

considered the papers submitted by the parties, and having heard oral argument on September 29,

1999 (Bruce D. Greenberg, Esq., for plaintiffs; Stephen M. Harburg, Esq., admitted pro hac vice,

for defendant), and the parties having submitted post-argument briefs, and the Court having

issued a written opinion dated November 30, 1999, *and a revised opinion dated 12/16/99* and for the reasons set forth in that written

opinion

IT IS on this __23 nd__ day of December, 1999, ORDERED as follows:

1

1. Plaintiff's motion for class certification on their claims for common law fraud and violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. ("CFA"), pursuant to R. 4:32-1(a) and (b)(3), is granted. Class certification is limited to plaintiffs' theory that the allegedly false claims in defendant's advertisements for its premium gasoline known as "93 Supreme" created a demand for that gasoline that artificially inflated and maintained a higher price for the product than it otherwise would have commanded in the market. The class being certified hereby is defined as follows:

> All persons in New Jersey who purchased Exxon 93 Supreme gasoline from May 15, 1995 through September 17, 1996. Excluded from the Class is defendant, any entity in which defendant has a controlling interest, and any of defendant's subsidiaries, affiliates, officers and directors.

2. Plaintiffs' motion for class certification on their common law fraud, common law negligent misrepresentation, and CFA claims based on a theory of direct reliance by class members upon defendant's advertising for 93 Supreme is denied, ~~for the sole reason that questions of law or fact common to the members of the class do not predominate over any questions affecting only individual members, as required by R. 4:32-1(b)(3) for class certification.~~

3. Plaintiffs Lucinda F. DeLima and Adam Trencher are certified as the class representatives.

4. The parties shall confer regarding the form and mechanics of notice to the class of this action. A management conference shall be conducted on January 14, 2000 at 10:00 A.M. to resolve any of those matters to which the parties have not agreed, and to address any other case management matters.

2

Jul-31-2001  03:27pm   From-WILENTZ                    732-855-6117        T-748  P.017/017  F-235

5.  A copy of this Order shall be served upon all counsel within seven days of the date

hereof.

ARTHUR N. D'ITALIA, A.J.S.C.

3

TOTAL P.04